627 So.2d 35 (1993)
Christopher Harold ALEXANDER, Appellant,
v.
STATE of Florida, Appellee.
No. 91-2541.
District Court of Appeal of Florida, First District.
November 12, 1993.
*36 Leo A. Thomas, of Levin, Middlebrooks, Mabie, Thomas, Mayes, & Mitchell, Pensacola, for appellant.
Robert A. Butterworth, Atty. Gen., and Edward C. Hill, Jr., Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Christopher Harold Alexander appeals his conviction of second degree murder with a firearm, raising the following seven issues: whether the trial court erred in (1) refusing to admit statements he made immediately after the shooting; (2) overruling objections to the prosecutor's closing argument; (3) failing to grant a mistrial after the prosecutor chose not to call an impeaching witness; (4) allowing the prosecutor to elicit the prior consistent statements of witness Neil Sims; (5) refusing to reduce the charges to manslaughter; (6) allowing the prosecutor to call Vincent Russo solely for the purpose of impeaching him and limiting cross-examination about statements made by Russo; (7) refusing to allow testimony of witnesses that the shooting appeared to be accidental.
We hold that the trial court erred in excluding the testimony of witnesses to the shooting that described Appellant's exclamations and actions immediately after firing the shot that killed the victim. Accordingly, we reverse the conviction and remand for a new trial.

I.
Apparently, a long-standing hostility existed between Alexander and the victim, Gabriel Mahoney, both of whom were in their late teens. Mahoney and his friends had several times been involved in fights with Alexander's friends, and Mahoney had twice attacked Alexander and had made threats against his life. On the night of the shooting, Alexander and twelve friends were at a party at a private home. Alexander and Neil Sims had handguns in their vehicles. Mahoney, who had not been invited because of the bad blood between him and Alexander, nevertheless showed up with six of his friends, calling himself "David Williams" and asking for Alexander.
Alexander and Sims had taken someone home and returned to the party after Mahoney arrived. Mahoney was in the kitchen when Alexander went into the bathroom. Alexander testified that when he was told that Mahoney was there, he believed Mahoney meant to carry out his threats to kill him. Sims was called to the bathroom, saw that Alexander was scared and angry, and offered to "get the guy to leave." Sims retrieved the pistol from his car and confronted Mahoney, telling him, "You need to take your ass and get the hell out of here." When Mahoney and his friends seemed not to understand, he said, "You remember Chris Alexander." Mahoney's sudden movement startled Sims, who kicked him and then cocked his gun, pointed it at Mahoney, and backed him out of the house.
Meanwhile, according to his testimony, Alexander had made his way to his truck, intending to leave, but then realized that his car keys were still in the house. When he heard someone say, "He's got a gun," he believed the reference was to Mahoney. He *37 felt responsible for the safety of the people in the house because he believed Mahoney had come there to get him, and so armed himself before going back to retrieve his car keys. As he approached the garage, Alexander saw Mahoney backing out with his arms raised in front of him in a position that led him to believe Mahoney might have a gun. Alexander raised his gun and "said something to get the person's attention ... and the gun went off." He testified that he did not intend to pull the trigger, that his purpose was to scare Mahoney so he would leave, that he could not believe "that the gun had went off," and that after the shot was fired, he believed Mahoney had ducked and was not hit.
Alexander was charged with first degree premeditated murder and Sims was charged with aggravated assault with a firearm. At Alexander's trial, the medical examiner testified that Mahoney died from a gunshot wound to the head and that he had alcohol in his blood. Joe Lafreniere testified that Alexander handed him the gun and that he went across the street and threw it in the bushes. The crime scene investigator testified that Lafreniere led him to the .357 Smith & Wesson, which had one expended round. A firearms examiner testified that the gun was the murder weapon, that it was in good working order, that it had not been modified, and that it took 3.5 pounds of pressure on the trigger to fire single action and 12 pounds for double action (i.e., it was not a "hair trigger"). Alexander's taped statement admitted the shooting. In it he claimed that the gun had discharged, but that "I didn't mean to do it," and that he wasn't trying to hit Mahoney, but was just trying to scare him.
Although Alexander did not remember what he said just before the gun went off, Sims testified that he said, "Remember me, motherfucker." Alexander was asked on cross-examination whether that could have been what he said, to which he replied: "I couldn't be sure... . Not very likely. That's not something I would say... . I'm not sure." Richard Fennell, Alexander's second cousin, testified it was Sims who made that statement when he confronted Mahoney inside the house. Troy Mabrie testified that as Alexander walked up the driveway, he raised his gun and said, "Remember me," then went behind a tree. On cross-examination of Sims and Lafreniere, defense counsel attempted to elicit statements Alexander made within seconds after the shooting, but the trial court ruled that the questions were outside the scope of the direct examination.[1] Alexander didn't remember what he had said immediately after the shot was fired.
Defense counsel attempted to impeach Sims by asking about the status of his prosecution, whereupon Sims stated that the prosecutor had told him that if he testified and told the truth, it could help him. On redirect, defense counsel objected to introduction of Sims's prior consistent statements made the night of the incident, citing section 90.801(2), Florida Statutes. The court overruled the objection, finding that "there is an implied charge or (sic) motive, bias and recent fabrication."
The prosecutor called Vincent Russo and told the court that he considered him a hostile witness because he had given a deposition "completely contrary in some very material ways to a statement that he gave to Investigator Roundy." Defense counsel objected that this was a way of introducing a prior inconsistent statement as substantive evidence of guilt. The court delayed ruling until the witness testified.
Russo testified that he went into the bathroom and tried to calm Alexander down, that Alexander "wasn't saying too much," that he "was more jumping up and down," and that when someone yelled out something about a gun, Alexander said, "Someone's got a gun, go get my gun." Defense counsel objected when the prosecutor started to ask about the statement Russo gave to Investigator Roundy. The prosecutor stated he was going to ask if Russo had made a statement that Alexander was saying, "I'm going to beat his ass." The court responded, "If your purpose is to introduce it as substantive evidence, that's different from impeaching, and I'm *38 concerned that the twist at this stage is moving towards substantive rather than towards impeaching."
Russo denied that Alexander had said in the bathroom, "I'm going to beat his ass." He also denied having grabbed Alexander as he was walking towards Mahoney, denied that Alexander had thrown him to the ground, and denied that by the time he got up, Alexander "had already said you motherfucker and had shot him." The court would not let the prosecutor go further and told him to research the question, stating: "The purpose here I think is not so much to impeach the witness as to say, to provide substantive evidence, and that's the part that concerns me."
On cross-examination, Russo testified that the gun was raised and fired in one sweeping motion. On redirect, Russo was asked if he ever told anyone that he heard the shot fired as opposed to seeing the shot fired. He said he didn't tell the police that he saw the shot fired, because they didn't ask. Defense counsel objected when the prosecutor asked Russo if he had told them that by the time he had gotten up, Alexander had already shot, arguing that the statement was not inconsistent. The court ruled:
I think it's appropriate to ask him that. It doesn't directly contradict, but inherent in it, it seems to indicate that. Again, this is all weight-of-the-evidence kind of argument. Objection is overruled.
Russo denied making the statement, and the prosecutor asked to impeach him. Defense again objected and the court offered to give a limiting instruction. Russo was shown the document and testified that "There's some in there that is not true ... I didn't make some of those statements." When asked if he had made the statement that "Chris was saying I'm going to beat his ass, I'm going to beat his ass," Russo said, "I don't recall saying that."
Defense counsel moved for a mistrial on several grounds, including the court's failure to allow full cross-examination of Lafreniere, Sims and Russo regarding Alexander's statements immediately after the shooting, and "the calling of witnesses for the purpose of using their testimony  their impeachment testimony as substantive evidence." The state argued that the attempted cross-examination was beyond the scope of direct, that the statements sought to be elicited occurred after the shooting and were self-serving, and that Sims's prior consistent statement was introduced to rebut the charge of recent fabrication. The court denied the motion for mistrial, noting that the defense was not limited in its case in chief and that defense counsel had declined the offer to give a limiting instruction on Russo's impeachment. After discussing statements made before and after an offense and noting that the latter are considered self-serving, the court asked the parties to proffer such testimony.
The prosecutor called D.A. Trippe, who denied that Alexander had made any kind of threat after Mahoney punched him in the eye several months before the shooting. Defense counsel objected to the attempt to impeach her with the handwritten notes of the state attorney's secretary taken when Trippe gave a statement, arguing that the prosecutor was trying to use the notes as substantive evidence of premeditation. The prosecutor argued that if Trippe denied making the statement, "At that point I intend to stop and offer extrinsic evidence from a witness to that statement," and asserted that the court could give "any limiting instruction that it feels is appropriate." The objection was sustained.
The prosecutor proffered the testimony of Investigator Roundy regarding Russo's statement, and the court agreed to wait until a transcript of Russo's testimony at trial had been prepared. Alexander's motion for judgment of acquittal or to reduce the charge to manslaughter, and his renewed motion for mistrial, were denied at the close of the state's case.
After Alexander testified, defense counsel called Trippe, whereupon the prosecutor again attempted to impeach her and defense counsel moved for mistrial. The prosecutor stated that he was "prepared to provide a witness who will impeach this witness on this subject matter" (i.e., the state attorney's secretary, Gail Kinsley). The court at first sustained the objection, but then allowed the *39 impeachment and offered to give a limiting instruction. The renewed motion for mistrial was denied. Defense counsel stated that the limiting instruction should be given when the extrinsic impeachment evidence was offered. Trippe denied stating to an assistant state attorney that Alexander had threatened to kill Mahoney (as reflected in Kinsley's handwritten notes) and testified that she had tried to tell him about Mahoney's threat to kill Alexander, "but he said he wasn't really interested in that."
The prosecutor attempted to impeach Marjorie Knapp (who testified that Alexander was "petrified" in the bathroom) using Kinsley's notes which reflected that Knapp had said Alexander was "very mad" and was screaming, "Get my gun." The defense objection was overruled and Knapp said she did not recall making the statement. Defense counsel's objection to a reference to Kinsley's notes on Mabrie's cross-examination was also overruled.
Defense counsel asked if the court would allow "witnesses to testify that it appeared to be an accidental shooting." After reviewing section 90.701, Florida Statutes, the court ruled that it would be "completely and totally prohibited" as lay witness opinions. Defense counsel proffered what the witnesses would testify: "They saw the whole thing. They saw him walk up. They saw the gun go off. And in their opinion it was an accident."
Defense counsel also unsuccessfully objected to testimony that a police officer recovered some of Alexander's papers and an automatic pistol clip from Sims's vehicle (Sims and Alexander had traded cars for two days so Sims could use Alexander's truck to move something). Alexander testified that he knew Sims sometimes carried a gun in his car, but that he did not see the clip the night of the shooting.
Alexander's father, chief of police at Pensacola Naval Air Station, testified that he saw his son around midnight on the night of the shooting, that they had a conversation and he told him to tell the truth, that he then called the sheriff's department and accompanied his son to the jail, and that his son was hysterical.
Fennell testified that when Alexander was in the bathroom and found out that Mahoney and his friends were at the party, he "started panicking," said he wanted his gun, and told Fennell he "was getting the hell out of there." Later Fennell saw the flash, but did not see Alexander shoot. On cross-examination, Fennell was asked if he remembered Alexander making the statement about Mahoney, "I'm going to beat his ass, I'm going to beat his ass." Fennell replied, "He may have said it. I don't remember." He stated that Alexander was "very scared," but he did not think he was mad. He admitted that when asked in his deposition whether Alexander was mad at Mahoney, he had said, "Yeah, I'm sure. He had been beat up by this guy twice." On redirect examination, he testified that Alexander had not said that he was mad, but he assumed it based on the fact that Alexander had been beaten up.
Throughout the defense case, the state's hearsay objections to statements Alexander made immediately after the shooting were sustained, the court finding that they were not spontaneous, were self-serving, and related to his state of mind after the shooting, not before. The proffered testimony indicated that Sims and Lafreniere ran up to Alexander right after the shooting, yelling, "What the hell are you doing?" Alexander allegedly said at first, "I didn't hit him," "I shot over his head," and "I was trying to scare him." When he realized Mahoney had been hit, Alexander allegedly said, "Oh, my God, I can't believe I just shot somebody," and "I didn't mean to do it." He then "freaked out" and started crying.
After reviewing the transcript of Russo's testimony, the court ruled that the state could impeach him with extrinsic evidence and again offered to give a limiting instruction. After the instruction, Investigator Roundy testified that Russo had stated to him that Alexander was saying in the bathroom, "I'm going to beat his ass." Upon objection that it was beyond the scope of direct examination, defense proffered that Russo had also said that Alexander was "terrified."
Gail Kinsley's testimony regarding the interviews with Trippe and Knapp was proffered, *40 but after defense objection based on Marrero v. State, 478 So.2d 1155 (Fla. 3d DCA 1985), the prosecutor withdrew the proffer on Trippe, and after further discussion he withdrew the proffer on Knapp.
Alexander's renewed motion for judgment of acquittal or to reduce the charge to manslaughter was denied at the close of all the evidence. His renewed motion for mistrial (which added as a ground the state's failure to call Kinsley) was made and denied after the jury began deliberations.
While discussing premeditation during closing argument, the prosecutor mentioned that Fennell testified Alexander "may have said that he was going to beat Gabe Mahoney's ass" and that Russo denied making a similar statement, but had been impeached with his statement to police the night of the incident. He discussed the evidence that just before the shot was fired, Alexander said, "Remember me, motherfucker." He then stated, "And when you judge the position of that statement with the statement get me my gun, I'm going to go beat his ass, I'm going to beat his ass, in the bathroom, you're talking about an individual who is mad." Later, the prosecutor made the following argument:
Now, I mentioned before that you'll have to consider lesser includeds. I'm arguing to you and I submit to you that this man right here is guilty of premeditated first degree murder, no matter how you slice it. And this remorse and this I didn't mean to kill him and all that, let me tell you what that boils down to. That boils down to consequences. And one of the tragic things about this case is that I think everybody who has listened to this has been impressed with is (sic) you've got a bunch of young people running around without a whole hell of a lot of common sense. And we have got a society that treats gun (sic) sometimes like they're toys.
MR. THOMAS: I object to the argument.
THE COURT: Overruled.
MR. CLARK: That's what Christopher Alexander had. He used that gun as an extension of his ego. And he may have had some remorse after the act was done, but that doesn't make Gabriel Mahoney any less dead and that doesn't make what he did any more right, because if he intended to do what he did, then it doesn't matter what his feelings were after the fact. And he intended to go up there and pull that trigger and hit Gabriel Mahoney and kill him.
Defense counsel reminded the jury, "as the Judge told you any prior statements of a witness that you heard to, quote, impeach that witness, is not evidence of the truth of the charges in this case." He argued that the testimony was that the shooting was an accident, not that it was self-defense, and that the evidence was uncontradicted that Mahoney had a reputation for violence, he had beaten and threatened Alexander, someone had said, "He's got a gun," and there was "the upward sweeping motion of Chris's arm just before the shot was fired." He continued:
There was contradictory testimony about what Chris said the second before the shot was fired. Neil Sims, who has charges pending against him, he said one thing. Chris, I submit, answered honestly, he said I don't recall, at a traumatic moment like that that's not hard to see. The other witnesses said that Chris did not say that.
After discussing the differing characters of Alexander and Mahoney, he said:
Now, if Gabe didn't go there to start trouble, why did Neil Sims pull a gun on him? Why did Neil Sims try to back him out of the house and get rid of him? I don't know why Neil Sims kicked him, and I think that tells you something about him. That is not Chris Alexander. Neil Sims is facing a serious felony charge, three years without payroll (sic). And when he testified and the prosecutor said was Chris mad, think back to his first reply. Chris was probably a little mad, probably a little mad. So that wasn't enough. So the prosecutor asked him was he mad. Was he mad? Well, yes, he was mad. Think about how that came out. But what did he say? He too said the same thing, one sweeping motion, one sweeping motion. And even if you believe that Chris Alexander said what Neil Sims said he said, that *41 doesn't change it one iota, doesn't change it one bit.
Discussing excusable homicide, defense counsel stated:
Did Chris really know what he was doing when he was yelling I'm going to beat his ass, where is my gun? What's going on in there? Overcoming the use of ordinary judgment. And I suggest to you that's exactly, exactly what the evidence shows, thereby rendering a normal person incapable of reflection.
On rebuttal, the prosecutor noted his agreement with defense counsel "that it is not very smart to kill somebody in front of witnesses," then continued:
Chris Alexander wasn't thinking about that at that time, because he was too pissed off to think about it. And as far as what he said right before the shooting, I ask you to listen and think back to Ashton Troy Mabrie, another one of the defendant's friends who says that he did say remember me right before the shooting. Mr. Mabrie is kind enough to his friend to drop off the motherfucker, but he says he said remember me, and that's consistent with Neil Sims. Did anybody think Neil Sims enjoyed himself testifying? I think all you had to do was look at him. I mean, he told the truth.
MR. THOMAS: Your honor, I object to the vouching of credibility.
THE COURT: Overruled.
MR. CLARK: Thank you. Because if he had wanted to lie, he could have come in and come up with a much harder story. He said he was a little mad, but he conceded he thought he was scared, too, and maybe he was, maybe there was an element of that, but there was plenty of anger to go along with that. He didn't come in and testify about any plan in the bathroom to kill Gabe Mahoney. It certainly might have been convenient for him to have done that if he really was interested in trying to hurt his friend and help himself with this nonexistent deal with the prosecution.
I'll tell you what really gives credibility to Neil Sims is the fact that on the night of the shooting, before he ever met me or any other prosecutor that he gave a statement to the police and he told the truth then and that it was consistent with what he told you in this trial. And Mr. Thomas wants you to accord good things to the defendant by virtue of the fact that he gave a statement that night, but not to Neil Sims because he's got some deal with the prosecution. Well, you look at Mr. Alexander's version of the events ...
I think Mr. Alexander told the truth insofar as he could tell the truth consistent with the facts and not tell you what really went on in that bathroom with regard to the premeditation aspect. That's why you have to look back at the circumstances surrounding this killing. That's why you have to look at those statements. I'm going to beat his ass is not a statement reflecting fear. Remember me, motherfucker, is not a statement reflecting fear. That's a statement reflecting a desire for revenge. And those are his friends that say he made those statements and those are the circumstances, that's the proof, that's the evidence that shows premeditation.
The jury found Alexander guilty of second degree murder with a firearm. His post-trial motion for judgment of acquittal and his motion for new trial or for conviction of a lesser offense were denied. Pursuant to the sentencing guidelines, he was sentenced to twelve years in prison (three years mandatory minimum) followed by five years probation.

II.
Under these particular circumstances, we find no reversible error in the trial court's refusing to reduce the charge to manslaughter, in failing to grant a mistrial after the prosecutor chose not to call Gail Kinsley, in allowing the prosecutor to call Vincent Russo and limiting cross-examination of Investigator Roundy regarding statements Russo made to him, in refusing to allow testimony of lay witnesses that the shooting appeared to be accidental, or in overruling objections to the prosecutor's closing argument. We conclude that the exclusion of Appellant's *42 statements made at the time of the shooting was reversible error.

A.
Although we affirm on the objections to the prosecutor's closing argument, we feel obligated to point out that the prosecutor's second challenged comment came perilously close to an improper vouching for the credibility of a witness.
We also note that when defense counsel sought to call witnesses to testify that the shooting appeared to them to be accidental, the more appropriate procedure would have been to determine whether they "cannot readily, and with equal accuracy and adequacy, communicate what [they have] perceived to the trier of fact without testifying in terms of inferences or opinions," whether the use of inferences or opinions "will not mislead the trier of fact to the prejudice of the objecting party," and whether the opinions and inferences "do not require a special knowledge, skill, experience, or training." § 90.701, Fla. Stat. (1991).
We reject Alexander's argument that Vincent Russo was called solely for the purpose of introducing his prior inconsistent statement as substantive evidence. The record shows that the prosecutor elicited from Russo on direct examination evidence that was helpful to the state's case.
We also reject Alexander's argument that the prosecutor improperly referred to Russo's prior statement as substantive evidence in closing argument. There was no specific reference to Russo's prior statement, and defense counsel raised no objection to the references in closing argument to the statements attributed to the defendant.

B.
Finally, we come to the issue that has given us the most difficulty. Alexander contends that the trial court abused its discretion in refusing to admit hearsay testimony regarding statements he made immediately after the shooting of the victim, which supported his position that the shooting was accidental. He asserts that the trial court erroneously ruled during cross-examination of Lafreniere, Sims, and Russo that the hearsay statements were outside the scope of the direct examination. He argues that the statements were part of the res gestae and should have been admitted as excited utterances, notwithstanding the court's finding that they were self-serving, citing Coxwell v. State, 361 So.2d 148 (Fla. 1978), and Coco v. State, 62 So.2d 892 (Fla. 1953).
He also contends that the statements should have been admitted during the defense case under sections 90.803(1), 90.803(2), or 90.803(3), Florida Statutes, because his state of mind was at issue, his statements were "excited utterance[s] relating to a startling event or condition" and were made while he was "under the stress of excitement caused by the event or condition," and they were also "spontaneous statement[s] describing or explaining an event or condition" which were made while he "was perceiving the event or condition, or immediately thereafter" and there was no evidence presented that they were "made under circumstances which indicated [their] lack of trustworthiness."
The state asserts that the trial court properly limited cross-examination to the subject matter of the direct examination, to prevent the long discredited tactic of using the state's case to introduce defensive evidence, citing Penn v. State, 574 So.2d 1079 (Fla. 1991), and Steinhorst v. State, 412 So.2d 332 (Fla. 1982). In Penn, the court cited Steinhorst for the holding that "questions on cross-examination must either relate to credibility or be germane to the matters brought out on direct examination." In Penn, a reporter was questioned about a conversation with the defendant regarding a letter in which he confessed to killing his mother. The reporter testified that the defendant did not indicate that anyone else had participated in the murder. The court did not allow defense counsel to cross-examine the reporter about other statements the defendant made during the conversation, noting that they could be introduced in the defense case. The supreme court ruled that the trial court had not abused its discretion, finding that the challenged testimony went beyond the scope of direct examination and would have tended to *43 bolster the theory of the defense, which the defendant should have developed by calling his own witnesses.
The state argues that the trial court did not err later in the defense case in excluding hearsay statements of the defendant that did not fit any of the exceptions to the hearsay rule. It asserts that the after-the-fact statements of memory or belief ("I didn't hit him," "I shot over his head," and "I was trying to scare him") are prohibited by section 90.803(3)(b), that the latter statement contradicts the defense of accidental discharge of the gun by indicating the purpose for firing the gun, and that even if believed, the statement would preclude the jury from convicting of anything less than third degree murder, citing Hooker v. State, 497 So.2d 982 (Fla. 2d DCA 1986), rev. denied, 506 So.2d 1041 (Fla. 1987), and Pressley v. State, 395 So.2d 1175 (Fla. 3d DCA), rev. denied, 407 So.2d 1105 (Fla. 1981).
The state contends that Alexander's live testimony informing the jury of his state of mind and his intentions that night, in addition to his taped statement to police, made the hearsay statements irrelevant. Noting that several witnesses testified that Alexander was scared and that he broke down and cried when he realized he had hit the victim, the state argues that any error was harmless. Alexander replies that had the jury believed that he lawfully armed himself and unintentionally shot Mahoney, he would have been acquitted, or at the very worst, convicted of manslaughter for causing a death by culpable negligence.
The state cites two cases as directly on point: Moore v. State, 530 So.2d 61 (Fla. 1st DCA 1988), which held that exculpatory statements of a non-testifying defendant are hearsay and do not fall into any exceptions to the rule; and Overton v. State, 429 So.2d 722 (Fla. 1st DCA), rev. denied, 440 So.2d 352 (Fla. 1983), which held that even if exculpatory statements of the defendant are considered part of the res gestae, they are self-serving and are not admissible. Alexander replies that these cases are distinguishable because in Moore, the court held it was improper to allow testimony regarding a police interview of the defendant the day after the crime was committed and Overton held that statements made at the time of the arrest were properly excluded as self-serving.

C.
We conclude that the trial court erred in excluding the testimony of witnesses to the shooting that described appellant Alexander's exclamations and actions immediately after firing the shot that killed the victim. This testimony was admissible under the res gestae rule now codified in sections 90.803(1), (2), and (3), Florida Statutes (1991), which define the conditions for admissibility of (1) spontaneous statements, (2) excited utterances, and (3) then existing mental and emotional conditions of the declarant. The statements about which these witnesses could testify were made almost simultaneously with the act of shooting, a period of time too short to support a finding of fabrication that would destroy the apparent trustworthiness of this evidence. The mere fact that statements are self-serving is not, in and of itself, a sufficient evidentiary basis for their exclusion from evidence. No legal principle excludes statements or conduct of a party solely on the ground that such statements or conduct is self-serving. State v. Johnson, 671 P.2d 215 (Utah 1983); State v. Wallace, 97 Ariz. 296, 399 P.2d 909 (1965); Commonwealth v. Fatalo, 345 Mass. 85, 185 N.E.2d 754 (1962). See also United States v. Dellinger, 472 F.2d 340, 381 (7th Cir.1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). While exculpatory statements of the accused generally are excluded from criminal cases because of their hearsay character, 29 Am.Jur.2d Evidence § 621 (1967), the courts of this state have long recognized an exception to this general rule where the statements form a part of the res gestae of the alleged offense. Jenkins v. State, 58 Fla. 62, 50 So. 582 (1909); Lowery v. State, 402 So.2d 1287 (Fla. 5th DCA 1981); Watkins v. State, 342 So.2d 1057 (Fla. 1st DCA), cert. denied, 353 So.2d 680 (Fla. 1977).[2] *44 Furthermore, Florida has followed a liberal rule concerning the admittance of res gestae statements. See Appell v. State, 250 So.2d 318 (Fla. 4th DCA), cert. denied, 257 So.2d 257 (Fla. 1971). Accordingly, we do not see any basis on this record for concluding that this testimony was lacking in apparent trustworthiness and probative value. Thus, we are impelled to conclude that the exclusion of the proffered testimony of res gestae statements in this case was an abuse of discretion and, under the circumstances of this case, cannot be treated as harmless error.
Moreover, we conclude that the trial court erred in ruling that this testimony was insufficiently related to the state's direct testimony from the witnesses to be admitted on their cross-examination by the defendant during the state's case. These statements by Appellant were part of his conduct at the time of the commission of the alleged offense and thus are not merely hearsay statements but amount to conduct in the nature of a verbal act. The state's interrogation of these witnesses called for a description of what happened when the shooting occurred and what Appellant had said immediately prior to the shooting. Consequently, the court's ruling to exclude further cross-examination as to Appellant's statements at and immediately after the shooting prevented defense counsel from presenting the complete picture of the circumstances of the shooting from the perspective of these witnesses. We do not read the supreme court's opinion in Penn v. State, 574 So.2d 1079 (Fla. 1991), to require, indeed even to permit, the exclusion of this evidence under the circumstances shown.
We also have serious reservations about the trial court's ruling to admit prior consistent statements on the issue of the credibility of certain witnesses because there was no showing of a substantial change in those witnesses' testimony. However, because the case must be reversed and remanded for a new trial on the grounds discussed above, and because this same issue would not necessarily arise in the same manner upon retrial, we do not consider it necessary to reach this point.
REVERSED AND REMANDED.
ZEHMER, C.J., and ERVIN, J., concur.
BARFIELD, J., concurs in part and dissents in part with opinion.
BARFIELD, Judge, concurs in part and dissents in part.
I concur in the majority opinion with respect to the last six issues, but I would not hold that the trial judge erred in excluding the hearsay testimony of witnesses regarding statements Alexander made immediately after shooting the victim.
With respect to Alexander's first contention, that the trial judge erroneously ruled during cross-examination of Lafreniere, Sims, and Russo that the statements were outside the scope of the direct examination, I would find that the case at issue is very close to Penn v. State, 574 So.2d 1079 (Fla. 1991), and that this trial judge did not abuse her discretion in sustaining the objections to the attempt to elicit Alexander's statements on cross-examination.
I would also find that this trial judge did not abuse her discretion in sustaining the state's objections to the attempt to elicit Alexander's statements during the defense case. The three exceptions to the hearsay rule upon which Alexander relied are derived from the old res gestae exception.
The majority's suggestion that the res gestae rule remains viable in codified form in section 90.803(1), (2), and (3), Florida Statutes (1991), ignores the substantial jurisprudence of this state and elsewhere discussed at length in Law Revision Council Note-1976 to the annotated statutes. It is clear that the legislature intended the death of the old res gestae approach to the admissibility of evidence, in favor of precisely stated exceptions to the hearsay rule. The need for such precision can be exemplified no better than in the very language of the majority opinion:

*45 The statements about which these witnesses could testify were made almost simultaneously with the act of shooting, a period of time too short to support a finding of fabrication that would destroy the apparent trustworthiness of this evidence.
This is nothing more than this appellate court making a finding of fact about trustworthiness which is inconsistent with the finding of fact made by the trial judge (the fact finder) on the same issue.
Sections 90.803(1) (spontaneous statements) and 90.803(3) (then existing mental, emotional, or physical condition) specifically provide that the statement is not admissible when it is "made under circumstances that indicate its lack of trustworthiness." The trial judge did not abuse her discretion in sustaining the objections to Alexander's hearsay statements during the defense case, to the extent that the ruling was based upon a determination that the statements were made under circumstances indicating their lack of trustworthiness (the trial judge found that the self-serving statements were not spontaneous, but were made in response to Sims' question, and that they indicated Alexander's state of mind after the shooting, which was not at issue).
As for section 90.803(2) (excited utterances), I note that in Overton v. State, 429 So.2d 722 (Fla. 1st DCA), rev. denied, 440 So.2d 352 (Fla. 1983), in which the defendant had sought admission of his exculpatory statements made immediately upon apprehension as "excited utterances," we held that the trial judge was correct in sustaining the state's objection on the ground that the statements were "self-serving," notwithstanding that they were part of the res gestae.
After hearing extensive testimony of the witnesses and argument of counsel, this trial judge, who was charged with making determinations of fact on matters of the admissibility of evidence, found that the proffered hearsay testimony was not trustworthy to show the existing mental or emotional condition of the declarant at the time of the shooting. I would not find that she abused her discretion in doing so, or that this court is in a better position to make such a determination.
I would affirm Alexander's conviction and sentence.
NOTES
[1] Later, during the case for the defense, the court sustained the state's objection to Mabrie's testimony that Alexander began to cry when he realized Mahoney had been hit and told Mabrie, "I didn't mean to do it."
[2] Courts in other jurisdictions in the United States recognize that out-of-court, self-serving statements of an accused are not inadmissible on hearsay grounds where they form part of the res gestae. See Harrell v. State, 470 So.2d 1303 (Ala. Crim. App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Reado v. State, 690 S.W.2d 15 (Tex. Ct. App. 1984); 29 Am.Jur.2d Evidence 712 (1967).